Elizabeth Kramer, State Bar No. 293129 (elizabeth@eko.law)
Julie Erickson, State Bar No. 293111 (julie@eko.law)
Kevin Osborne, State Bar No. 261367 (kevin@eko.law)
**Erickson Kramer Osborne LLP**
182 Howard Street # 736
San Francisco, CA 94105
Phone: 415-635-0631
Fax: 415-599-8088

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BENJAMIN CHANG, individually and on behalf of other similarly situated individuals,<br><br>    Plaintiffs,<br><br>vs.<br>INTERACTIVE BROKERS LLC; AND DOES 1-10<br>    Defendants. | Case No.: 5:21-cv-5967<br><br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**<br><br>**COMPLAINT FOR**<br>1.  Aiding and Abetting Fraud;<br>2.  Aiding and Abetting Breach of Fiduciary Duty;<br>3.  Violation of California Business and Professions Code, sections 17200, et seq. |

Plaintiff BENJAMIN CHANG ("Plaintiff"), on behalf of himself and others similarly situated ("the Class"), brings this action against Defendant INTERACTIVE BROKERS, LLC ("IB") and DOES 1-10 (collectively, "Defendants") for actual damages suffered by Plaintiff and the class, and for other recovery specified herein for harm caused by IB aiding and abetting fraud and aiding and abetting breach of fiduciary duties. Plaintiff alleges the following based upon information and belief, except as to his own actions, the investigation of his counsel, and the facts that are a matter of public record, including orders and reports referenced herein of the U.S. Commodity Futures Trading Commission ("CFTC"), orders and reports of the Financial Industry Regulatory Authority ("FINRA"), and orders and reports of the Securities and Exchange Commission ("SEC"), as follows:

## I. <u>INTRODUCTION</u>

1. Plaintiff and the class are victims of a Ponzi scheme perpetrated with the Defendant Interactive Brokers' ("IB") knowing assistance. The scheme was devised by Haena Park, an IB customer who solicited funds from Plaintiff and the members of the class through fraud and deceit and then misused those funds for her own gains and to make phony dividend payments to other investors caught up in the scheme.

2. IB recognized Park's account was used to conduct a fraud, identifying her suspicious activity in reports reviewed by compliance analysts more than a dozen times during the life of the scheme. Rather than scrutinize the activity, freeze the account, and report Park to the authorities, IB disregarded its own compliance department's red flags and written internal compliance policies to further aid Park, a lucrative IB customer, to continue the scheme through its brokerage services.

3. Through her IB account, Park lost over $14 million of her investors' contributions before the scheme was discovered by regulators and Park was arrested. She was sentenced to 3 years in prison in 2018. In 2020, IB's participation in the scheme came to light when the SEC, FINRA, and CFTC all simultaneously announced a joint action against IB for its role in the fraud and for other regulatory compliance violations. For the first time in the CFTC's history, it found an investment firm liable for violations of the Bank Secrecy Act (17 CFR § 42.2).

4.     Plaintiff now brings this action to recover from IB the damages sustained as a result of the firm's wrongdoing and substantial assistance in the Park scheme.

## II.  FACTUAL ALLEGATIONS

### Regulatory Background

5.     Federal law requires IB to know its customers and understand their transaction behavior. Under applicable regulations, IB must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. §§ 1023.220. Thus, IB is required to collect information about the holder of each account. Where an entity opens an account, IB must obtain information concerning the individuals who control the account.

6.     The Financial Industry Regulatory Authority (FINRA) likewise imposes know-your-customer requirements and mandates "reasonable diligence, in regard to the opening and maintenance of every account," including the obligation "to know (and retain) the essential facts concerning every customer."

7.     Section 17(a) of the Exchange Act and Rule 17a-8 require broker-dealers registered with the SEC, including Defendant IB, to comply with the reporting and record-keeping requirements of the Bank Secrecy Act and the related regulations promulgated by the Financial Crimes Enforcement Network or FinCEN.

8.     IB is required to establish and implement policies and procedures to achieve compliance with the Bank Secrecy Act and related regulations, specifically, appropriate risk-based procedures for conducting ongoing customer due diligence, including (i) understanding the nature and purpose of customer activity and develop a customer risk profile; and (ii) conducting ongoing monitoring to identify and report suspicious transactions and to obtain information regarding the beneficial owners of legal entity customers. IB is also responsible for ensuring that its personnel are trained on and adhere to those policies and procedures.

9.     In compliance with the relevant regulatory requirements, IB conducted due diligence on Park and monitored her accounts.

**Interactive Brokers' Hands-Off Compliance Approach**

10.     IBG LLC is one of the world's largest brokers. It presently claims over $9 billion in equity capital and executes approximately 2.5 million trades per day. It has over a million client accounts in over 200 countries and territories around the world. Its subsidiary, IB is the electronic brokerage subsidiary of IBG LLC and is registered as a broker-dealer with the SEC and as a futures commission merchant with the CFTC. It is an online broker of various investment instruments, including stock, bonds, options, futures, and other securities. It is also a foreign currency ("forex") Dealer Member of the National Futures Association.

11.     Historically, IB and its parent and affiliate companies have held themselves out as the leaders in technology-focused brokerage services, designing and using automated systems to operate more efficiently without sacrificing integrity. It claims such milestones as being the first to use handheld computing devices on a trading floor, the first to use a fully automated trading system on Wall Street, and the largest online broker in the United States as measured by daily average revenue trades reported.

12.     The firm's focus on technology also permeates its compliance practices. In the name of efficiency, the firm uses a compliance department that "automates" its compliance process. According to the firm's SEC disclosures,

> The philosophy of the Compliance Department, and our company as a whole, is to build automated systems to try to eliminate manual steps in the compliance process and then to augment these systems with experienced staff members who apply their judgment where needed. […] In light of our automated operations and our automated compliance systems, we have a smaller and more efficient Compliance Department than many traditional securities firms.

13.     In order to stem off illegal trading activity, IB's compliance system assigns "red flags" to suspicious account activity, which are then reviewed by compliance analysts. According to IB's own internal policies, its compliance team specifically flags accounts where a customer's inflow of funds exceeds their known income or resources. It also flags and reviews accounts where a customer's transactions or volume of aggregate activity are "inconsistent with the expected purpose of the account" or are "unusual and unexpected" in comparison with other market participants.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

14.     When compliance analysts see flagged activity in customer accounts, they notify the company's compliance department officers, who then investigate the account's activity. Officers then use IB's institutional knowledge of the customer's business practices, trading activity, trading patterns, and all other facts and circumstances relating to the particular customer and transaction to determine whether the activity is suspicious. If it is, IB increases scrutiny of the account. IB's policies require such suspicious activity to be reported to regulators and, when appropriate, IB must place restrictions on the account.

15.     In addition to its own internal flagging and reporting systems, outside sources notify IB of suspicious activity. For example, regulatory agencies investigating suspicious activity inform IB of investigations when the activity involves IB's customers or platforms. Additionally, agencies and exchanges alert IB when they suspended trading of IB customers.

16.     Since at least 2013, IB's compliance department has been wholly ineffective in preventing and reporting fraudulent investment activity. In part due to its blind devotion to automation, the firm pared down its compliance department's resources so completely that the company lacked simple, customary oversight practices employed in nearly all other broker-dealer compliance departments. For example, it lacked a basic case management system with supervisory review of compliance analyst determinations, failed to audit compliance officer investigations, permitted flagged accounts to operate without escalation, and had no system in place to ensure higher scrutiny for accounts with repeated flagged activity or numerous reports of suspicious behavior across various reports. Thus, IB continued to service customer accounts that had glaring red flags, including Park's, through which she pilfered investor funds unchecked.

**IB's Compliance Practices Made It Ideal for Fraudulent Schemes**

17.     In times of economic volatility, investment schemes collapse and frauds are revealed. Ponzi schemes are a type of investment fraud where investors receive returns they are told are generated from investment profits, when in fact they are contributions from other investors. In the last three years, as market volatility reached a crescendo, the number of Ponzi schemes reported to authorities has jumped to the highest levels since the 2008 financial crisis.

18.     IB's submissive compliance systems enabled other arms of the firm to become Wall Street's preferred partner for Ponzi schemes and other fraudulent investment schemes.

19.     An SEC Order issued in August 2020 found that IB's compliance analysts internally identified 78 potentially fraudulent deposits, sales, or withdraws in a 1-year period from 2016 to 2017, but IB permitted the transactions to proceed with no investigation and failed to report the activity to regulators. During that same period, according to the Order, IB frequently allowed customers it knew to have violated securities regulations and other criminal laws to carry out suspicious transactions and permitted customers to trade securities that the SEC had suspended. The SEC cited IB for numerous violations and fined it over $11 million for violations of industry compliance rules.

20.     IB compliance systems also regularly confirmed that suspicious customers had misled the firm regarding the nature of certain transactions, but permitted them to proceed. For example, since 2013 the firm experienced a significant expansion in its relationships with foreign financial institutions, including hundreds of institutions located in what anti-money laundering agencies had identified as in "high-risk" jurisdictions. IB routinely accepted the representations from these institutions that they were depositing funds to IB through first-party transfers, a designation that requires little compliance oversight. IB did nothing to verify the accuracy of these representations and later learned that many of these transfers were not, in fact, first-party transfers, but were third-party transfers that required heightened scrutiny. Despite this knowledge, IB allowed these institutions to continue conducting hundreds of millions of dollars of first-party transactions, thereby allowing them to avoid surveillance.

21.     IB also disregarded reports from third parties identifying suspicious and illegal activity. In 2015, the Chief Compliance Officer of a third-party financial derivatives exchange notified IB in writing of suspicious activity of an IB customer regarding market orders in index futures. The customer's activity had been flagged on multiple occasions by IB's compliance department. Nevertheless, IB allowed the customer to continue trading and failed to report the activity to regulators. In 2016, the SEC identified five IB customers apparently located in Beijing as participants in an insider-trading scheme. IB declined to conduct an investigation into the

customers' accounts. In 2015, FINRA submitted a formal inquiry to IB regarding a Belizean customer's manipulative trading scheme involving microcap securities. Rather than investigate the account and prevent further manipulation, IB determined the activity was "normal" and permitted further trading. From 2014 to 2016, IB received 37 regulatory inquiries from FINRA and the SEC, but filed only 3 reports of suspicious activity reports. FINRA fined IB $15 million for these and other compliance-related violations in 2020.

22.     IB was home to significant Ponzi schemes during this period as well. In 2016, the CFTC charged an IB customer who had appeared in multiple IB surveillance reports with defrauding investors of nearly $2 million in a Ponzi scheme. The following year, another IB customer who previously served nearly three years in prison for an investment scheme was charged by the CFTC in relation to an $11 million Ponzi scheme. Not only had the customer appeared in IB's internal surveillance reports, but the victims of the scheme had contacted IB to voice concerns regarding the customer's activity. IB ignored the warnings and allowed the activity to continue. In 2018, an IB customer pleaded guilty to a Ponzi scheme involving over $15 million. The customer had appeared in over 460 IB internal reports identifying suspicious activity over three prior years. From these reports, IB knew the customer had deposited, and then lost, more than ten times his net worth, but permitted the scheme to continue.

**Interactive Brokers Has Profited from Enabling Its Customers' Fraudulent Activity**

23.     IB, as a broker-dealer, derives revenues from two primary sources – commissions and net interest income. All fraudulent investment activity described above directly benefited IB through both of these revenue streams.

24.     IB earns commissions on all transactions executed on its platform. These revenues come directly from its customers and from the market makers, sometimes referred to as "dark pools," where it executes its customers' transactions. Thus, the more transactions customers make through IB, and the more money that is transacted, the more revenues the firm generates. And as the number of transactions executed through IB has increased, its revenues have similarly increased. IB's total revenues more than doubled from 2010 to 2018. Its revenues from commissions increased from $353 million in 2009 to $706 million in 2019.

25.     In addition to commissions, broker-dealers generate revenue from interest on assets held in their accounts. IB generates net interest income by attracting as much money as possible to its brokerage and earning interest on those funds. During the last decade, net interest income has become IB's dominant source of revenue, accounting in 2020 for more than 55% of its total revenue and increasing from $122 million in 2009 to $1.73 billion in 2019. As a consequence, IB customers with substantial holdings are a robust source of revenue to the firm and are given whatever leeway is necessary to keep their funds at IB, even IB knows the activity in their accounts is suspicious or illegal.

26.     These revenues, and the consequent profits, were what motivated IB to facilitate suspicious transactions through its platform without further investigation or reporting to regulatory authorities.

**Interactive Brokers Aided and Abetted the $23 Million Haena Park Ponzi Scheme**

27.     From 1998 to 2008, Haena Park worked for various financial firms. Beginning in 2010, she began soliciting investments for a new fund she intended to establish from her network of friends, family, and college classmates. She promised these investors she would deposit their funds in futures and forex investment devices and would guide the investments. Park represented to her investors that she had an extremely profitable investment history in forex and expected future gains of up to 50 percent.

28.     Also in 2012, Park filed documents for a trading account in her own name at IB. She stated in the documents that she was self-employed as an "at home trader" with a net worth between $5 and $10 million and had no other sources of income.

29.     In 2013 and 2014, Park established a series of fund entities under the name "Phaetra," including Phaetra Capital Fund, Phaetra Capital International Fund, and Phaetra Capital Master Fund. Along with a fourth fund Park had established in 2010 called Argenta Group, these funds were the vehicles Park claimed she would use to invest her clients' money. Park was a founder, President, and Chairperson of the Phaetra entities and the Argenta Group and was the sole signatory on Argenta Group's bank account.

30.     Between January 2010 and May 2016, Park received at least $23 million from 50 investors, which she deposited into her personal bank accounts and a bank account in the name of the Argenta Group. Park typically transferred the full amount of these funds immediately to her IB account, which she used to buy and sell futures and forex investment instruments. In total, Park deposited $19 million to the IB account and misappropriated the remaining $4 million. IB was the only broker-dealer that Park used to conduct transactions involved in the scheme and Park was the sole person authorized to trade in her brokerage account at IB.

31.     Until November 2016, Park continued to solicit funds from investors. When a potential investor agreed to invest funds with Park, she produced a document titled "Agreements for Investments," which purported to set forth the terms of a trading arrangement wherein investor money would be deposited into Pheatra funds, charged an annual fee of the principal, and liquidated upon the investor's request. She claimed to be investing in a pooled "friends and family" fund run by the Phaetra entities, rather than a pool of investment funds run through IB.

32.     Both before and after receiving funds from her investors, Park represented a history of success and a likelihood of future gains, presenting charts with titles such as "Returns.pdf," or "Returns 2009- 2012.pdf," which purported to show a history of strong growth over the preceding months. Park distributed documents purporting to be "account statements" and made written and oral reports to participants in the Pheatra fund claiming regular annual growth of over 30%.

33.     The claims Park made to investors regarding her successful investing history were false. Park's IB trading account consistently showed significant losses during the period from 2010 to 2016. In nearly every month it was in operation, Park's IB account lost money. From 2012 to 2014, it lost $2.5 million, $2.2 million, and $2.3 million, respectively. In 2015, the account lost a staggering $7.8 million. As of 2016, the account had lost $17.5 million and another $1.5 million in cash was withdrawn. Rather than disclosing these losses, Park produced sham statements to her investors showing impressive gains from her Phaetra funds. At times, Park accepted new investment funds from one investor and used some or all of those funds to make Ponzi-like

dividend payments to other investors as an enticement to keep their money in her funds or make additional investments.

34.     Park failed to disclose these heavy losses to her investors. She further failed to disclose to them that she was misappropriating investor funds to pay other investors phony dividends or for her own personal expenses.

35.     Even though Park's IB account suffered excessive losses, she continued making enormous deposits into her IB account. For example, in 2012, she made several deposits into her account totaling $2.7 million, despite the fact she had shown no addition sources of income. In the next three years, her aggregate deposits totaled $2.6 million, $3.4 million, and $7.9 million, respectively. Many of the deposits were so sizeable, often involving hundreds of thousands of dollars, that they were manually reviewed and processed by IB personnel. When taken together, these deposits far exceeded Park's stated net worth as originally disclosed in her account opening documents and revealed to IB she was trading – and losing – investor money.

36.     Through its compliance department's observance of irregularities in Park's trading activity, IB was aware that Park was engaged in an investment scheme. Park's account appeared on various surveillance reports generated by IB's compliance department at least five times between October 2014 and January 2016. She was identified in a monthly report identifying customers who had more than 6 withdrawals or deposits in a given month. IB compliance analysts reviewed the reports showing suspicious activity in Park's account but, in contravention of IB's own internal policies, IB continued to process the transactions without escalation, additional oversight, or intervention.

37.     Park also appeared more than 10 times between 2013 and 2015 in an internal IB report that identified account holders whose losses exceeded a certain percentage of their stated liquid net worth. This report was run monthly and searched for data over the prior six months. Each time Park's account appeared on this report, IB compliance analysts manually reviewed Park's historical trading activity. And although IB was aware that Park's account contained investor funds, and was incurring enormous losses, IB allowed Park to continue trading without additional scrutiny.

38. Through the red flags on Park's account, IB knew Park was pooling the funds of third parties, an activity that was inconsistent with the expected purpose of the Park's account and was unusual and unexpected given her stated net worth and occupation. Rather than escalate the account to compliance officers, report the activity to regulators, and restrict the account as required under IB's written compliance policies, IB committed acts and omissions that furthered the fraud. IB encouraged analysts to close reviews of Parks account when it appeared on surveillance reports and to use boilerplate language to document their decisions, including stating they found there were "no apparent third party deposits" and that "activity does not appear unusual," so that Park's trading activity would not trigger further investigation or monitoring.

39. Park's scheme depended on IB's willingness to aid her brazen fraud. Park, as an industry insider, was aware of the compliance requirements of broker-dealers such as IB. She was aware that surveillance reports would identify her activity when she suffered losses and made deposits that approached or exceeded the value of her net worth and demonstrated an illegitimate business purpose. Yet Park made no effort to conceal her scheme from IB, depositing and then losing more than her stated net worth in 2014 and 2015 alone. The reason Park selected and utilized IB's brokerage services was because it was known as the best suited broker-dealer on Wall Street to partner with in a fraudulent scheme.

40. Because of the volume and value of Park's trades, there was no limit to what IB would allow Park to do. IB ignored its surveillance reports and aided Park's scheme in the name of profits. The transactions in which Park engaged resulted in direct revenue for IB. Park was engaged in what the SEC described as "extremely active day-trading," meaning she made a high quantity of high-value transaction through IB. Each one of Park's transactions generated payments to IB, both from Park's commissions directly and from the dark pools where IB executed her transactions. Moreover, the millions of dollars Park deposited into her IB account each year constituted a valued source of net interest income for IB. Despite IB's awareness of the red flags assigned to Park's account, IB gave Park a vehicle to continue losing her investor's funds so long as she continued to generate revenue for IB.

**Regulatory Action Against Interactive Brokers**

41.     The Park Ponzi scheme was ultimately reported to authorities, who enjoined the Park Ponzi scheme accounts' activity in 2016 and prosecuted Park in 2018. At the time of Park's sentencing, the Assistant U.S. Attorney who prosecuted the case identified the scheme's victims as including senior citizens who lost their life savings, immigrants who worked multiple jobs for decades, and a paraplegic who lost $4 million after telling Park he would soon retire because of his deteriorating health.

42.     In August 2020, the CFTC filed charges against IB in relation to the Park Ponzi scheme and other related compliance failures under the Bank Secrecy Act (17 CFR § 42.2) and required IB to pay over $12 million in penalties and disgorgement. The charges were brought in conjunction with similar charges and fines assessed by the SEC and FINRA against IB for its various compliance failures. It was the first time in the CFTC's history it brought such charges against a registered merchant; the first joint enforcement action by the CFTC, SEC, and FINRA; and the largest the largest ever fine in an anti-money laundering enforcement action involving the securities and futures industries.

### III.   JURISDICTION AND VENUE

43.     This action is brought as a class action for aiding and abetting fraud, for aiding and abetting breach of fiduciary duty, and for violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq*.) for monetary and equitable relief due to IB's negligent, unlawful, and unfair conduct.

44.     This Court has subject matter jurisdiction over Plaintiffs' individual claims under 28 U.S.C. § 1332(b) based on diversity of citizenship.  The amounts in controversy for Plaintiffs' individual claims exceed $75,000, exclusive of interest and costs and the Parties are diverse.

45.     The Court has personal jurisdiction over IB because it aided and abetted Park's Ponzi scheme and misappropriation of investor funds in California. A number of the investors Park solicited and defrauded, including Plaintiff, were residents of California.

46.     Venue is proper in this District under 28 U.S.C. § 1391 because IB is subject to personal jurisdiction in this District for the claims alleged and a substantial part of the events and omissions giving rise to these claims occurred in this District.

## IV.  **THE PARTIES**

47.     Plaintiff Benjamin Chang is, and at all relevant times was, a resident of the state of California. Plaintiff was introduced to Park through family members and was one of the people from whom Park solicited funds. Plaintiff provided Park approximately $167,000 to invest and Park represented to Plaintiff it would be invested in forex. Park sent Plaintiff statements indicating his investment was growing when in fact his funds had been lost, redirected to other investors as Ponzi-style dividend payments, or used for Park's personal benefit.

48.     Defendant IB is a corporation engaged in financial services for retail customers, organized and existing under the laws of the State of Connecticut, with its principal place of business located at One Pickwick Plaza, Greenwich, Connecticut. It is a wholly owned subsidiary of IBG LLC, which is, in turn, owned and managed by Interactive Brokers Group, Inc. and IBG Holdings LLC.

49.     The true names and capacities of Defendants sued in the Complaint under the fictitious names of Does 1 through 10, inclusive, are unknown to Plaintiff who therefore sues such Defendants by such fictitious names.

50.     All the Defendants described above shall collectively be referred to as "Defendants." Whenever reference is made in this complaint to any act of Defendants, such allegation shall mean that each Defendant acted individually and jointly with the other Defendants named in that cause of action. Whenever reference is made in this complaint to any act of any corporate or other business Defendant, such allegation shall mean that such corporation or other business did the acts alleged in the complaint through its officers, directors, employees, agents, and representatives while they were acting within the actual or ostensible scope of their authority. At all relevant times, each of the Defendants has acted as an agent, representative, or employee of each of the other Defendants and has acted within the course and scope of said agency, representation, or employment with respect to the causes of action in this complaint. At all

relevant times, each Defendant has committed the acts, caused others to commit the acts, or permitted others to commit the acts referred to in this complaint.

## V.  TOLLING THE STATUTES OF LIMITATIONS

51.    IB, aware of the illegal Park Ponzi scheme and its injurious effects, fraudulently concealed the scheme by refusing to report Park and continuing to execute the account transactions that were the scheme's lifeblood.

52.    IB and Park fraudulently concealed from Plaintiff and the class members that Park's account had lost funds exceeding her net worth and approaching $15 million, including essentially every dollar of the funds Plaintiff and the class members gave Park to invest on their behalf.

53.    IB and Park were aware that Plaintiff and class members did not know about the Park investment fraud. IB and Park had superior and exclusive knowledge of that fraud. Despite reasonable diligence on his part, Plaintiff was kept ignorant by IB and Park of the factual bases for these claims for relief.

54.    Plaintiff reasonably relied to his detriment on the information provided to him by Park, which neither disclosed the true nature of her investment fraud or the involvement and knowledge of IB and was never contacted regarding the fraud by IB. As a result of this concealment, Plaintiff and the class members did not believe that it was necessary to file a lawsuit.

55.    Plaintiff did not discover, and exercising reasonable diligence could not have discovered, the facts establishing IB's participation in Park's fraud scheme until the CFTC made public its findings and fined IB for its involvement in the scheme in August 2020. Plaintiff learned of the relevant actions of IB and Park through the CFTC, SEC, and FINRA actions and their coverage in the press. Only then did Plaintiff retain counsel to vindicate his rights. Because Plaintiff and the class members could not have reasonably discovered the facts constituting IB's violations until August 2020, all applicable statutes of limitation were tolled until that time.

# VI. CLASS ALLEGATIONS

56.     Plaintiff brings this action to seek monetary relief as a class action pursuant to Federal Rules of Civil Procedure, Rule 23, on behalf of themselves and the following Class:

> All persons or entities who invested funds in the Haena Park scheme between January 1, 2010 and May 30, 2016.

57.     Plaintiffs reserve the right to amend the class definition if discovery or further investigation demonstrate that it should be expanded or otherwise modified.

58.     The members of the class are so numerous that joinder of all members would be impracticable. On information and belief, approximately 50 persons or entities invested funds in Park's scheme. The class members are identifiable from information and records. Notice of this action can be provided to all members of the class, and the disposition of their claims in a single action will provide substantial benefits to all parties and to the Court.

59.     Plaintiff's claims are typical of the claims of other members of the class. Plaintiffs and each class member invested in the Park Ponzi scheme and were subject to the wrongful conduct alleged in this complaint.

60.     Plaintiff is a member of the class and will fairly and adequately represent and protect its interests. Plaintiff has no interest contrary to or in conflict with the interests of the other class members, and is not subject to any unique defenses.

61.     Plaintiff's counsel are competent and experienced in class action and investor fraud litigation and will pursue this action vigorously.

62.     There are questions of law and fact common to the members of the class that predominate over any questions affecting only individual members, including:

    a.   Whether Park defrauded investors;

    b.   Whether Park breached a fiduciary obligation to Plaintiff and the members of the class through her fraudulent scheme;

    c.   Whether IB knew that Park was orchestrating a fraud;

    d.   Whether IB acted to aid and abet, join, or participate in Park's fraudulent scheme;

e. Whether IB knowingly carried out transactions in furtherance of Park's fraudulent scheme despite its own compliance department's red flags and in deviation from its own internal policies;

f. Whether IB's conduct violated California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

g. Whether in view of their investment losses, Plaintiff and the class members are entitled to damages and restitution.

63. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons:

a. It is economically impractical for members of the class to prosecute individual actions;

b. The class is readily ascertainable and definable;

c. Prosecution as a class action will eliminate the possibility of repetitious litigation; and

d. A class action will enable claims to be handled in an orderly and expeditious manner, will save time and expense, and will ensure uniformity of decisions.

64. Plaintiffs do not anticipate any difficulty in the management of this litigation as a class action.

## VII. <u>CAUSES OF ACTION</u>

### First Cause of Action

### Aiding and Abetting Fraud

65. Plaintiff incorporates the above allegations by reference as if set forth fully herein.

66. As set forth more fully above, Park perpetrated fraud on her investors through a series of materially false and misleading statements and omissions. Among other fraudulent conduct, Park (i) misrepresented the history of her investment portfolio; (ii) misrepresented that her investors' accounts were increasing in value; (iii) failed to disclose to investors that she had lost millions of her investors' funds; (iv) misrepresented the nature of payments she was making to her investors as "dividends" when those funds were really the contributions of subsequent

investors; and (v) concealed from investors that she had misappropriated and misused millions of dollars in investor funds for improper purposes, like financing personal luxuries.

67.    These misrepresentations and omissions were material to investors, who had no reason to believe that their money would not be used as they intended and as Park represented.

68.    Plaintiff and class members reasonably relied to their detriment upon Park's fraud when they provided funds for the subject investments.

69.    IB knowingly and substantially assisted Park in unlawfully defrauding Plaintiff and the class, in at least the following respects:

    a.    Acting in furtherance of the Park Ponzi scheme, including by processing thousands of transfers of funds, despite identifying regulatory and compliance "red flags" discussed above;

    b.    Executing and condoning atypical banking procedures to service Park's account;

    c.    Concocting pretextual explanations to justify dismissal, without further investigation, of account alerts generated by IB's internal compliance department in connection with Park's account;

    d.    Carrying out improper and atypical financial transactions such as aggregate deposits of funds exceeding Park's net worth; and

    e.    Continuing to service Park's account after it appeared more than a dozen times on surveillance reports demonstrating suspicious activity without scrutinizing, suspending, or reporting the account activity to authorities.

70.    The transactions IB executed in furtherance of Park's fraudulent scheme, including the transfer of funds exceeding the net worth of a customer who had repeatedly appeared in reports identifying suspicious activity and who had historically sustained extraordinary losses, and the means by which these transactions were executed, were highly atypical, both in nature and frequency.

71.    IB was more than an accidental participant in Park's fraudulent scheme. In connection with providing substantial and material assistance to Park, and as described above, IB had actual knowledge of Park's fraudulent scheme and acted in assisting Park in that:

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

a. IB conducted due diligence when it entered into its relationship with Park and thereafter throughout its business relationship with Park, as required by IB's internal policies and procedures, as well as by applicable laws and regulations;

b. By virtue of this due diligence, IB was aware of Park's stated net worth and expected monthly income;

c. Through its compliance department's surveillance program, which was mandated by regulations and by IB's own internal policies, IB regularly reviewed Park's accounts, learned the nature of Park's trades, and understood that Park was pooling funds solicited from investors ostensibly to be managed by Park and invested in forex and futures through IB;

d. IB regularly reviewed Park's account by manually processing a substantial number of transfers into her account, representing investor deposit of investment proceeds;

e. IB knew that these investors' money was improperly commingled with Park's personal funds as it was deposited to IB from and withdrawn from IB to Park's personal bank account; and

f. To facilitate Park's scheme, IB deviated from its standard compliance protocols and effectively covered up the red flags its compliance system identified so that Park's account would not be suspended or subjected to heightened scrutiny.

72. IB's conduct was a substantial factor in causing harm to Plaintiff and the members of the class because it facilitated the actual loss, misuse, and misappropriation of their investments.

73. IB substantially benefited from, and at present is the only one to benefit from, its participation in the Park Ponzi scheme. Through the scheme IB earned revenues from commissions and net interest income derived from Park's investors' funds.

74. As a direct and proximate result of IB's aiding and abetting of fraud, Plaintiff and the class members have been damaged in an amount to be determined at trial.

### Second Cause of Action

### Aiding and Abetting a Breach of the Fiduciary Duty

75. Plaintiff incorporates the above allegations by reference as if set forth fully herein.

76. Park was the custodian of the funds Plaintiff and the members of the class provided her for the purpose of investments.

77. Park maintained complete or substantially complete control over the scheme's investment funds. Park had complete and lone control over the IB accounts in which investor funds were deposited. Park also entered agreements with her investors personally and provided promises of satisfactory returns on their investments.

78. By reason of her controlling positions, actions, and direct and indirect representations to Plaintiff and the class members, and by reason of the investors having deposited funds into Park's control with the understanding she would act in accordance with her promises in regard to the use of such funds, Park owed Plaintiff and the members of the class fiduciary duties of loyalty and care and to deal honestly and in good faith. By misappropriating, commingling, and otherwise misusing investor funds, and otherwise acting as alleged herein in violation of her fiduciary duties to her investors, Park breached fiduciary duties she owed to Plaintiffs and the class members.

79. With knowledge of Park's breaches, IB lent aid, gave substantial encouragement, and gave substantial assistance to Park to breach her fiduciary duties, or ratified or adopted Park's acts for IB's benefit. As demonstrated by the facts stated herein, IB substantially assisted Park's breaches of fiduciary duty with knowledge that Park was breaching those duties. Park's breaches of fiduciary duty were enabled by and would not have been possible but for IB's actions and inaction.

80. As a direct and proximate result of IB aiding and abetting of breach of fiduciary duty, Plaintiffs and the class members have been damaged in an amount to be determined at trial.

**Third Cause of Action**

**Cal. Bus. & Prof. Code §§ 17200, *et seq*. ("UCL")**

81. Plaintiff incorporates the above allegations by reference as if set forth fully herein.

82. The UCL forbids any unlawful, unfair, or fraudulent business act or practice.

83. IB's conduct is unlawful because it violated applicable Bank Secrecy Act and anti-money laundering regulations, including but not limited to 17 CFR § 42.2 and other laws requiring

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

implementation of a program to ensure adequate due diligence of customers and their account activity.

84.     IB's conduct also is unfair in violation of the UCL by reason of IB's unscrupulous, oppressive, and substantially injurious actions and inaction. Among other unfair conduct, IB:

      a.  Acted in furtherance of the Park fraudulent scheme, including by executing dozens of transfers and by permitting the commingling of investor funds;

      b.  Knowingly facilitated Park's misappropriation and misuse of investor funds;

      c.  Continued to aid Park in defrauding investors, and failing to take corrective action, in response to the panoply of other irregular investing activities detailed above, many of which IB noted through its compliance department but pretextually explained away; and

      d.  Failed to implement and adhere to mandatory Bank Secrecy Act and anti-money laundering protocols.

85.     The gravity of the harm resulting from IB's unfair conduct outweighs any potential utility of the conduct.  IB's failure to take appropriate and necessary steps to protect investors, even in the face of several suspicious account activity alerts generated by its own compliance systems, harms the public at large and forms part of a common and uniform course of wrongful conduct. There are reasonably available alternatives that would have furthered IB's business interests, such as immediately reporting the suspicious account transactions and other atypical activities associated with Park's accounts.

86.     The harm from IB's unfair conduct was not reasonably avoidable by investors.

87.     Plaintiffs and the members of the class suffered injury in fact, and lost money or property, as a direct and proximate result of IB's unlawful and unfair conduct.  Plaintiff accordingly seeks restitution as provided for under Cal. Bus. & Prof. Code § 17203, in addition to reasonable attorneys' fees and costs.

### VIII.   PRAYER FOR RELIEF

Plaintiff, on behalf of himself and the Class, prays for relief and judgment against Defendants as follows:

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1. For an order certifying the proposed class pursuant to Federal Rules of Civil Procedure, Rule 23;

2. For an order appointing Plaintiff Benjamin Chang and his counsel to represent the class;

3. For actual and compensatory damages according to proof;

4. For punitive damages;

5. For pre-judgment and post-judgment interest;

6. For an award of attorneys' fees, costs, and expenses as authorized by applicable law; and

7. For such other and further relief as this Court may deem just and proper.

## IX.  **DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself and the class, demands a trial by jury on all issues so triable.

Dated this 2nd day of August 2021.      Erickson Kramer Osborne, LLP

_____

Elizabeth Kramer
Kevin Osborne
Julie Erickson

Attorneys for Benjamin Chang